Argued June 29, affirmed September 21, petition for rehearing
denied October 12, 1955, United States Supreme Court
denied petition for certiorari March 5, 1956

# REYNOLDS ALUMINUM COMPANY *v.*
## MULTNOMAH COUNTY ET AL

287 P. 2d 921

604

*Allan Hart* argued the cause for appellant. On the briefs were Hart & Veazie, of Portland.

*Bernard Shevach*, of Portland, argued the cause for respondents. With him on the brief were William M. Langley, District Attorney, Willis West, Deputy District Attorney, and Maguire, Shields, Morrison & Bailey, all of Portland.

Before WARNER, Chief Justice, and TOOZE, LUSK, LATOURETTE and PERRY, Justices.

TOOZE, J.

This is a suit to enjoin the enforcement and collection of certain personal property taxes for the year 1950, brought by Reynolds Aluminum Company, a corporation, as plaintiff, against Multnomah county, Terry D. Schrunk, as sheriff and tax collector, Wiley W. Smith, as assessor, and Si Cohn, as county clerk, respectively, of Multnomah county, as defendants. Decree was entered in favor of defendants, and plaintiff appeals.

The personal property tax involved in this litigation is against the machinery and equipment of an aluminum manufacturing plant located at Troutdale, in Multnomah county, Oregon, now owned by plaintiff.

The Troutdale plant was constructed for the United States government in 1942 by Defense Plant Corporation. A few years later the Defense Plant Corporation was dissolved, and Reconstruction Finance Corporation succeeded to the ownership of the plant. About August, 1949, for reasons not material here, Reconstruction Finance Corporation conveyed title to the plant to the United States.

In 1946, Reconstruction Finance Corporation (acting through the War Assets Administrator) leased the Troutdale plant (and three other aluminum plants) to Reynolds Metals Company, a corporation. Reynolds Metals Company immediately took possession of the plant under this lease and commenced manufacturing operations therein.

In the latter part of 1949, after Reynolds Metals Company had been in possession of the Troutdale plant as lessee for about three years, an opportunity arose to purchase this and the three other plants owned by the United States. The purchase agreement, entitled "Letter of Intent", was executed on December 21, 1949. This letter of intent provided that the four plants in question were purchased by the plaintiff, Reynolds Aluminum Company, a corporation, and a wholly-owned subsidiary of Reynolds Metals Company.

No question is involved in this case concerning taxes levied against the real property at the Troutdale plant. By congressional act, all real property owned by Reconstruction Finance Corporation and Defense Plant Corporation was made subject to state and local taxation (USCA, Title 15, § 607). Therefore, the land

and land improvements at Troutdale were taxable while the plant was owned by Reconstruction Finance Corporation and Defense Plant Corporation, and they were carried on the Multnomah county assessment roll beginning in 1942.

The manufacturing machinery and equipment (classified as tangible personal property by ORS 307.020 (3)) of the Troutdale plant were placed on the Multnomah county assessment roll as of one o'clock a.m. of January 1, 1950, as the property of plaintiff, and at an assessed value of $3,410,000. The tax levied thereon and here in issue is in the sum of $199,144, plus interest. The time for assessments against real and personal property is fixed (for the year 1950) by the provisions of § 110-335, OCLA, as amended by ch 440, § 4, Oregon Laws 1941. This section of the statute was later amended: ch 701, Oregon Laws 1953 (ORS 308.210), but the time for assessment remains the same; viz., January 1 of each year, at 1 a.m.

In its brief filed in this court, plaintiff states the issues before us as follows:

"The general issues are, first, whether an allegedly 'preliminary' purchase and sale agreement, entered into on December 21, 1949 between appellant as vendee and the United States as vendor, automatically and immediately transferred the equitable and beneficial ownership of the machinery and equipment at the above plant from the United States to appellant, so that the federal constitution gave conditional sanction to taxation of this machinery and equipment on January 1, 1950, or whether the real ownership of the machinery and equipment remained in the United States until June 29, 1950, when the United States conveyed the plant to the company by a deed and bill of sale; and second, if this first question is resolved against appellant,

whether the Oregon statutes in effect in 1950 authorized the taxation of personal property in these circumstances, subject to the condition on which the United States Supreme Court has sanctioned such taxation.''

██ The solution of the problem rests entirely upon the interpretation we place upon the provisions of the letter of intent. Although entitled ''Letter of Intent'', nevertheless, upon the formal acceptance of its terms by the plaintiff and Reynolds Metals Company, on December 21, 1949, it became, in our opinion, a contract for the sale and purchase of the Troutdale plant (along with the three other aluminum plants). In construing this contract, we must construe it as a whole, applying the well-understood and established rules for the construction of written instruments.

It is unnecessary to set forth the contract in full. We will quote a few of the express provisions contained therein which, we believe, will be sufficient to establish the status of the personal property in question as to ownership for taxation purposes. From a factual standpoint, the primary question is whether equitable title to the property rested in plaintiff on and prior to January 1, 1950. This must be determined from the agreement itself. The contract provides:

''Dec 15 1949
25000

''Reynolds Aluminum Company
  Reynolds Metals Building
  Third and Grace Streets
  Richmond 19, Virginia
''Attention: Mr. Richard S. Reynolds, Jr., President
  ''Re: Plancor 226-X, Hurricane Creek, Arkansas;
      Plancor 226-K Jones Mills, Arkansas;
      Plancor 226-O, Troutdale, Oregon;
      Plancor 652, McCook, Illinois.

"Gentlemen:

"General Services Administration (hereinafter referred to as *Seller*) *hereby sells* to Reynolds Aluminum Company (hereinafter referred to as *Purchaser*), a wholly owned subsidiary of Reynolds Metals Company, and *Purchaser hereby buys* the Hurricane Creek, Arkansas, Alumina Plant known as Plancor 226-X; the Jones Mills, Arkansas, Aluminum Reduction Plant known as Plancor 226-K; the Troutdale, Oregon, Aluminum Reduction Plant known as Plancor 226-O; and the McCook, Illinois, Aluminum Sheet Mill known as Plancor 652, all of which plants are now under lease to Reynolds Metals Company. The plants sold shall in each instance include the land as described in the lease (and in those instances in which the land is not specifically described in the lease, as presently included within the plancor) together with all buildings, improvements, machinery, equipment, and all other property of every kind owned by the Government presently covered by the leases between Seller and Reynolds Metals Company, and any easements, water rights or rights of way now owned or hereafter acquired by the United States of America or Seller appurtenant to said plants (all of which property hereby sold is hereinafter referred to as the Plants), subject to the following terms and conditions:

"(1) The aggregate purchase price is Fifty Million Eighty-One Thousand Nine Hundred Fifty-Eight Dollars ($50,081,958.00). Two Million Five Hundred Eighty-One Thousand Nine Hundred Fifty-Eight Dollars ($2,581,958.00), *shall be payable on the execution of this agreement* together with interest at the rate of four percent (4%) from July 1, 1949 to date of payment; amounts of rental paid by purchaser for the period beginning July 1, 1949 which are to be credited on the down payment shall not bear interest. The balance of the purchase price, Forty-Seven Million Five Hundred Thousand Dol-

lars ($47,500,000.00), shall be payable in annual installments as follows:

" * * * * *

"(2) Reynolds Metals Company will lease the plants from Reynolds Aluminum Company for a period of twenty-five (25) years for an annual consideration not less than the amount required to meet the annual payments of principal and interest required to be made by Reynolds Aluminum Company. *Such lease shall also include the obligation on the part of Reynolds Metals Company to pay the taxes on the plants, to insure them or cause them to be insured to meet the requirements of the purchase money mortgages hereinafter mentioned and to maintain the plants in the condition they are in at the time of the execution of the lease, ordinary wear and tear excepted. The above lease shall contain a provision that so long as there remains any unpaid balance of the purchase price the lease will not be cancelable except with the consent of Seller.*

" * * * * *

"(4) Title to the plants will be conveyed by deed or deeds of conveyance and by bill or bills of sale, effective as of July 1, 1949, and Purchaser will execute simultaneously purchase money mortgages on the real property and personal property hereby sold to secure payment of the unpaid balance of the purchase price. Each such mortgage shall secure the entire unpaid balance of the purchase price of all four plants.

"(5) Delivery of the deeds, and bills of sale if required, and purchase money mortgages shall supersede and terminate the present leases of the plants between Seller and Reynolds Metals Company as of July 1, 1949, but shall in no way affect any rights or obligations of Seller or Reynolds Metals Company under said leases which had accrued as of said date.

"(6) Transfer of title shall be made subject to and including a National Security Clause mutually satisfactory to the Government and to Purchaser.

Purchaser shall be given a period of one hundred and twenty (120) days or such additional time as may be mutually agreed upon by Seller and Purchaser within which to obtain approval of a National Security Clause satisfactory to Purchaser. In the event a National Security Clause satisfactory to Purchaser is not so obtained, Purchaser shall have *the option to rescind this sales agrement* [sic] as provided in paragraph 19 hereof in which event the present leases between Seller and Reynolds Metals Company shall be revived as of the date of their termination and continue in full force and effect as if this contract had not been executed. Purchaser agrees to diligently endeavor to obtain the aforesaid National Security Clause in as short a time as possible.

"\* \* \* \* \* \*

"(8) Purchaser will obtain at its own expense and affix to the deeds transferring title to the plants and to the purchase money mortgages such Federal and state documentary stamps as may be required by law. Purchaser shall cause the deeds and purchase money mortgages to be duly recorded and will pay all recording fees and other expenses as may be required by law, state and Federal, in connection with such instruments. *Seller will make available for Purchaser's inspection and use such abstracts of title or other title papers as are in its custody covering the plants, but it is understood that Seller will not be obligated to furnish any continuation title reports or title insurance or to pay for any title expense or other charges pertaining to the transfer of the plants.*

"(9) *In the event a title examination* or examinations instituted subsequent to the acceptance of this agreement by Purchaser and prior to the delivery of the deeds (but in no event more than ninety days after receipt by Purchaser of such title evidence as Seller is able to deliver) *reveals or reveal a defect or defects in title* which the Purchaser reasonably regards as rendering the same unmar-

ketable, *then this agreement may,* at Purchaser's option, *be rescinded and nullified by Purchaser* as provided in paragraph 19 hereof unless the Seller shall elect to cure at its expense such defect or defects and shall cure the same within sixty days after notice from Purchaser.

"* * * * * *

"(11) *This sale shall expressly include,* however, *all rights, title and interest of the Seller and of the United States of America, without warranty of title, express or implied,* in and to all of the facilities, rights and assets, including contract rights, of the plants and of Plancors 226-X, 226-K, 226-O and 652. * * *

"(12) *Purchaser will be responsible for all insurance coverage, taxes, maintenance, costs and other expenses incurred in connection with the captioned properties applying to the period from and after July 1, 1949. If any of the property be damaged or destroyed by any cause after July 1, 1949 and before the full purchase price shall have been paid, such damage or destruction shall not affect this agreement but the full purchase price shall be paid irrespective thereof.*

"* * * * * *

"(19) In the event that this sales agreement is *rescinded* by Purchaser in accordance with the terms hereof, or in the event that, through no fault of the Purchaser, this transaction is not consummated, the leases of the plants between Seller and Reynolds Metals Company shall be revived as of the time of their termination and shall continue in full force and effect, notwithstanding any of the terms or provisions hereof, as if this sales agreement had never been executed, in such event any portion of the purchase price or of interest thereon theretofore paid by Purchaser hereunder shall be credited against rentals which have accrued or which will accrue under the leases between Seller and Reynolds Metals Company. In no event shall Seller or Purchaser or Reynolds Metals Company

be liable for any accrual of interest on such payments of principal and rent respectively.

"*  *  *  *  *

"(29) It is agreed that spare parts capitalized under Plancor 1646, materials and inventories not capitalized under the plancors 226-X, 226-K, 226-O, and 652 are not included in this sale and that purchaser will continue to be responsible for such spare parts, materials and inventories until such time as Seller elects to remove them from the plants at any time prior to December 31, 1950. *Purchaser shall give Seller assignable rights of ingress and egress for the purpose of such removal and shall cooperate with and assist Seller in processing the raw materials to saleable form.*

"This agreement is executed in quadruplicate. If the foregoing terms and conditions are acceptable to you, please indicate your acceptance by executing and returning to this Administration three copies of this agreement within seven days from the date hereof.

"Very truly yours,

[Sgd.]  PAUL L. MATHER
Liquidator of War Assets
General Services Administration

"Accepted this 21st day of December, 1949
REYNOLDS ALUMINUM COMPANY
By [Sgd.]  R. S. Reynolds Jr.

President

"To the extent that the foregoing letter of intent affects Reynolds Metals Company it is accepted this 21st day of December, 1949
"REYNOLDS METALS COMPANY
By[Sgd.]  R. S. REYNOLDS JR.

President".   (Italics ours.)

Under date of December 20, 1949, the General Services Administration addressed another letter to

plaintiff and Reynolds Metals Company, the material portion of which reads:

> · "Referring to the Letter of Intent dated December 15, 1949 covering the sale to you of the Hurricane Creek Alumina Plant, the Jones Mills and Troutdale Reduction Plants and the McCook Sheet Mill, *it is understood and agreed between us that upon your acceptance thereof, the leases,* except as to the rights and obligations specifically reserved, *are cancelled and terminated by virtue of such acceptance as of July 1, 1949."*   (Italics ours. )

The foregoing was accepted by plaintiff and Reynolds Metals Company on December 21, 1949.

As its first assignment of error, plaintiff alleges:

> "The trial court erred in holding that the Letter of Intent was not 'significantly different' from an executory contract of sale, and that therefore it was within the rule of S.R.A. Inc. v. Minnesota, 327 U.S. 558, 66 S. Ct. 749, 90 L. Ed. 854 (1946), viz., that the federal constitution permits state taxation (subject to the government's prior lien for the unpaid balance of the purchase price) of government property which the United States is selling under a sale contract, if the contract is an executory contract of sale or its equivalent."

In support of this assignment of error, plaintiff contends that the letter of intent was merely a preliminary and conditional sale agreement, resembling an earnest money agreement, and that it was distinguishable from the conventional executory contract of sale in important and material respects.   In its brief, it then states:

> " * * * the S.R.A. case's sanction for state taxation of property which the government has contracted to sell, is applicable only if the sale contract is an executory contract of sale or its equivalent, passing a present beneficial interest; * * * ."

From this we understand that plaintiff will concede that if the sale contract is an executory contract of sale or its equivalent, passing a present beneficial interest to the purchaser, then the property sold is subject to state taxation, by virtue of the decision in *S.R.A. Inc. v. Minnesota,* supra.

Counsel for both sides to this controversy have ably argued in detail the legal and factual problems involved on this appeal, not only in their well-prepared briefs, but also upon their oral arguments in this court. To comment herein upon the many points they sought to make and establish by argument and references to authorities would extend this opinion far beyond the necessities of the case. However, by not specifically mentioning herein or discussing the several points contended for or the numerous authorities cited and quoted from, we do not wish it to be understood that we did not give full consideration to all of them. For the purposes of this opinion, we feel it is necessary only to state our conclusions.

■■ From the provisions of the contract and, in particular, from the emphasized portions thereof, supra, we conclude that the agreement between the parties was an executory contract of sale and that at least the equitable title to the property passed to plaintiff immediately upon the execution thereof; viz., December 21, 1950. The provision respecting title examination is not a mandatory provision nor a condition precedent to the passing of title. If the title proved faulty, then plaintiff was given a right to rescind, an option which it could exercise or not as it wished. A right to rescind a contract presupposes an existing, binding contract, absolutely good and enforceable until effective rescission takes place. This provision of the

contract was solely for benefit of plaintiff, and un-doubtedly was inserted in the contract in the light of the fact that the government was under no obligation to warrant title. In passing, we note that the title of the government proved to be good, so the occasion for exercising the right to rescind never arose. At most, the provision respecting the right to rescind for defective title was a condition subsequent, and in no way affected the legal status of the parties at the time the contract was executed.

What we have said respecting the right to rescind for defective title applies with equal force to the provision regarding a National Security Clause, paragraph (6) of the contract, supra.

In the very first paragraph of the agreement we finds words speaking in the present, not *in futuro*. "Seller hereby sells" and "Purchaser hereby buys" are the terms used. Purchaser agreed to and did pay more than two million dollars upon the purchase price on December 21, 1949, part by credits on rental, part by a supply of aluminum pig, and the balance by check dated and delivered December 21, 1949. The supplemental letter of December 20, 1949, supra, referred to *"the sale"* to plaintiff of the Troutdale plant, and upon acceptance by plaintiff on December 21, 1949, specifically provided that the prior leases are presently canceled and terminated as of July 1, 1949. Considering the contract as a whole, the effect of this latter provision was to place plaintiff in possession of the property as owner and lessor and Reynolds Metals Company as lessee on December 21, 1949, although their respective obligations to each other, and to the United States, related back to July 1, 1949. The arrangement in the contract for Reynolds Metals Company to assume the status of lessee as to plaintiff was

for the protection of the United States. The contract itself provided for the execution of the deed and bills of sale (if needed), the purchase money mortgage (including the provisions of such mortgage, in detail, and conditions respecting foreclosure thereof, including a guarantee of $10,000,000 by Reynolds Metals Company for payment of deficiency judgments, if any), and other minute details for the final closing of the transaction.

■ Moreover, on March 3, 1950, plaintiff addressed a letter to Reynolds Metals Company, outlining the contractual relationship between itself and Reynolds Metals Company, largely as fixed by the letter of intent, and in that communication made the following significant statement:

> "By agreement with the United States * * * *Reynolds Aluminum Company became the owner as of July 1, 1949* of the four Government plants at * * * Troutdale, Oregon * * *." (Italics ours.)

This letter, in which it describes itself as *owner* of the plant as of July 1, 1949, was written by the plaintiff more than three months prior to the execution of the deed and the purchase price mortgage (and bill of sale) provided for in the contract of sale. The above statement which we have emphasized is a part of the stipulated facts in this case and obviously it is a definite admission against interest on the part of plaintiff in this litigation. *Oxley v. Linnton Plywood Association,* 205 Or 78, 284 P2d 766; *State v. Anderson,* 10 Or 448, 454; 4 Wigmore, Evidence 68, § 1069.

Another provision of the contract pointing out its true character as an executory contract of sale and purchase is the immediate assumption by plaintiff of all risk of loss of or damage to the property dating

from July 1, 1949. It also is significant that the United States felt it necessary to specifically reserve in the contract a right in itself of ingress to and egress from the premises sold, a provision wholly unnecessary if it continued to be the sole owner until the deed was actually executed.

On January 1, 1950, at 1 a.m., plaintiff at the very least was the equitable owner of all the property involved in this litigation *and was in actual and exclusive possession and control of the whole thereof.* In any event, the United States retained legal title solely for its security, if, in truth, it retained it at all. Under an executory contract of sale and purchase of land the vendee is treated in all respects as the owner of 'the property, although he has an equitable interest only. Until the contract is fully performed and the vendee is entitled to a conveyance of the legal title, the vendor retains the legal title simply as security for performance by the vendee. *City of Reedsport v. Hubbard et ux.,* 202 Or 370, 390, 274 P2d 248, *Harder et ux. v. City of Springfield et al.,* 192 Or 676, 686, 236 P2d 432. These rules respecting the sale of real property apply with equal force to the personal property transferred to plaintiff as an integral part of the entire transaction. *Soderstrom v. White,* 68 ND 293, 279 NW 306, 117 ALR 391, and note; 46 Am Jur 589, Sales, § 418. In view of the applicable law, the personal property involved in this suit was subject to taxation by defendants on January 1, 1950, and was properly assessed in the name of plaintiff. *Edward Hines Lbr. Co. v. Lane County,* 196 Or 420, 248 P2d 720; *Ken Realty Co. v. State,* 247 Ala 610, 25 So2d 675; *S.R.A., Inc. v. Minnesota,* supra; *City of New Brunswick v. U. S.,* 276 US 547, 48 S Ct 371, 72 L ed 693; § 110-312, OCLA, as amended by ch 405, Oregon Laws 1949 (ORS 308.105).

In all essential respects this case is governed by the rules announced in *Edward Hines Lumber Co. v. Lane County,* supra. There is no material distinction to be drawn between the situation prevailing in the Hines Lumber Company case and that prevailing in the instant controversy. The Hines Lumber Company decision was based upon the decision of the United States Supreme Court in *S.R.A., Inc. v. Minnesota,* supra.

We have stated that plaintiff was "at least" the equitable owner of the property on January 1, 1950. We used this qualifying term because of the contention earnestly urged upon us by defendants that on January 1, 1950, plaintiff was actually the legal owner of the property involved. We recognize that there is merit in this contention, but it is unnecessary for us to decide the question in this suit. We leave it open for decision in a case where such decision is necessary to decide the issues. Equitable title, with a right to and actual possession and control of the property, is sufficient to justify the tax in this case. However, we note that the contract itself, as well as the instruments transferring title executed June 29, 1950, provide specifically that legal title should vest in plaintiff as of July 1, 1949. On December 21, 1949, after the down payment on the purchase price was made by plaintiff, nothing remained for it to do as a condition precedent to its right to demand a deed and bill of sale and close the transaction upon execution by it of the purchase price mortgage as provided for in the contract. No particular time was set in the contract for execution and delivery of deed and bill of sale. The right to rescind given plaintiff by the contract was for its own benefit, and was a right it might waive. Defendants maintain that regardless of the date of

execution of the deed and bill of sale, legal title to the property related back to, and vested in plaintiff as of, July 1, 1949, the date which fixed the respective rights and obligations of all parties to the transaction, and cite in support of that theory a number of authorities. *Gray v. Beard,* 66 Or 59, 133 P 791; *Krakow v. Wille,* 125 Wis 284, 103 NW 1121; *Nicholson v. Congdon,* 95 Minn 188, 103 NW 1034; *Greenfield v. Olson,* 143 Minn 275, 173 NW 416; *Land O'Lakes Dairy Co. v. Wadena County,* 229 Minn 263, 39 NW2d 164.

Section 110-101, OCLA, as amended by ch 440, Oregon Laws 1941, defines property subject to assessment and taxation as follows:

"All real property within this state and *all tangible personal property* situated within this state, except as otherwise provided by law, shall be subject to assessment and taxation in equal and ratable proportion." (Italics ours.)

Section 110-312, OCLA, as amended by ch 405, Oregon Laws 1949, provided:

"Except as otherwise specifically provided, *all personal property* shall be assessed for taxation each year at its situs as of the day and hour of assessment prescribed by law; * * *." (Italics ours.)

Section 110-312, OCLA, as amended, supra, prescribed *to whom* personal property may be assessed, as follows:

" * * * Personal property may be assessed in the name of the owner *or of any person having possession or control* thereof. (Italics ours.)

In the light of these statutes, it is manifest that the assessment in this case was properly made by defendants. We are in no way concerned with the en-

forcement of the tax lien; that is not an issue in this case. Yet it might be well to point out that ample provision is made by statute for the collection of the tax without in any manner affecting any right or lien of the United States. *Hines Lumber Co. v. Lane County,* supra; § 110-839, OCLA: § 110-828, OCLA.

The decree is affirmed.

PERRY, J., did not participate in this opinion.